FRANCES L. COCHRAN, by her next friend, ALBERT G. LEWIS,

*vs.*

ELIZABETH McBEATH, administratrix of JOHN McBEATH, deceased, and SAMUEL METEER.

*New Castle, April T.* 1822.

By articles, executed before marriage, it was agreed that the intended wife should, after the marriage, hold to her sole and separate use, and subject to her disposal, certain real and personal estate to which she was previously entitled. No trustee for the wife was created in the contract. *Held*, nevertheless, that a court of equity will protect the wife against creditors of the husband, who were proceeding, under judgments against him at law, to take in execution the property so settled upon her.

Under a marriage contract a separate estate may be created in the wife, without the intervention of trustees. And this is true both as to real and personal estate, and whether the claim of the wife in the particular case be against the husband, or against his creditors. With respect to *personal* estate, the appointment of a trustee for the separate use of the wife has never been deemed necessary ; and, upon the weight of authority, a trustee is not necessary to a separate use of *real* estate. The decisions on this point fully reviewed.

Marriage is a valuable consideration to support a contract between husband and wife. In equity the form of the contract, so that it be in writing, is not material. Equity, on account of the consideration, will compel the execution of the contract ; and, for that purpose, will hold the husband to be a trustee for the separate use of the wife during her life-time, of the rents and profits of her real estate, and of her goods and chattels, as also it will hold her heir at law to be a trustee to carry into effect any disposal of her real estate made by way of appointment under the marriage contract.

There is no difference, with respect to the principles before stated, between devises to the separate use of the wife without trustees, and marriage articles without trustees,—except that the reason for protecting the rights of the wife under marriage articles is stronger than under a a devise, because under the former her rights rest upon a valuable consideration, whereas a devise is voluntary.

It is not necessary to the validity of a marriage contract that it should be recorded, nor that any publicity or notoriety should be given to it Secrecy or concealment, in such case, is therefore not evidence of fraud   Nor is it necessary that any schedule or inventory of the goods and chattels secured for the separate use of the wife should be annexed to the contract.   Nor is it necessary, in order to bind creditors, that the contract shall expressly secure the wife's property against liability for the husband's debts.   Creditors stand on the same footing with the husband, and whatever binds him binds them.

The signature of the wife to the marriage contract is not essential to give it validity.   It operates as a grant by the husband, in consideration of the marriage, and takes effect against him upon her acceptance of it and intermarriage with him.

The pretended burning by the complainant of the marriage contract, in order to pacify the dissatisfaction of her husband's mother, who had no interest in it, is not evidence of fraud, to affect the complainant's rights under it as against other persons.

The joint possession by the husband and wife of the goods and furniture stipulated to be for her separate use is not evidence of fraud nor a bar to the wife's claim,—such joint possession, after marriage, being consistent with the wife's title under the contract.

The mere acquiescence of the wife in her husband's receipt of the rents, profits and income of her separate estate though it may make his acts already done under such acquiescence valid, and may discharge him from any subsequent account for sums received by him, is not an abandonment of her separate estate ; and her inattention or laches in this respect cannot prejudice her.

Bill in Equity for an Injunction.—This bill was filed on behalf of the complainant, Frances L. Cochran, a married woman, by her next friend, to restrain the defendants, who were judgment creditors of her husband, Joseph W. Cochran, from further proceeding in an execution which had been levied by them upon certain goods and chattels to which she claimed to be entitled as her separate estate under an anti-nuptial contract.   At the time of her marriage with Cochran, on the 26th of January, 1808, the complainant enjoyed by the will of her first husband, Doctor Thomas Evans, the third part of the rents and profits of his real estate, which was of considerable amount ; also the interest

of £400,—all during her life, to be paid annually. Also, as the widow of Philip Lewis, deceased, she held her dower in his real estate. Besides, she had furniture and other articles of personal estate about her. Cochran and his wife used the goods and furniture, as in ordinary cases of husband and wife, and he was in the receipt of her rents and interest from the time of the marriage until the year 1819. In the years 1818, 1819 and 1820, his affairs became embarrassed, and sundry judgments were recovered against him. Among other judgments against him was one recovered at the suit of Samuel Black, trustee of Sarah Armitage, in the Supreme Court for New Castle County, at the November T. 1819. This judgment was recovered in a suit against Cochran on a recognizance entered into by him, in the month of August 1814, as the original trustee of Sarah Armitage. Having been removed from his trusteeship and Samuel Black appointed to succeed him, the suit upon the recognizance was brought by Black for the recovery of certain trust funds which had come to his (Cochran's) hands. Like suits were also brought by Black against John McBeath and Samuel Meteer, who were Cochran's sureties in the recognizance. Judgments were recovered against each of the recognizors for $3194,96. McBeath and Meteer, the sureties, paid the money for which the judgments were recovered, and thereupon took an assignment of the judgment against Cochran, pursuant to the statute in that behalf. They then proceeded as the assignees of the judgment, to sue out *fieri facias* attachments under it, which were levied upon the goods and furniture claimed by the complainant, Frances L. Cochran, under the marriage contract. The rents devised to her by Doctor Evans, and the rents of her dower in the real estate of Philip Lewis, were attached in the hands of the tenants. The present bill, setting forth the above state of facts, was filed to restrain the assignees from further proceedings at law against the goods and rents.

The answer of the defendants admitted the intermarriage

of the complainant with Joseph W. Cochran, on the 26th of January, 1808, and that she had title, at the time of the intermarriage, to the property in the bill set forth : also it admitted the proceedings upon which the judgment held by the defendants against the said Cochran for $3194,96 was founded, and that, upon the assignment of said judgment to them, they had proceeded, as in the bill alleged, to collect the same by *fieri facias* attachments against the rents of the real estate held by the complainant at the time of her intermarriage and by execution levied upon certain goods and chattels which were in the joint possession of the complainant and her husband, the said Cochran. But that the goods and chattels levied on were the same which had been the property of the complainant at the time of her intermarriage the defendants did not admit. And with respect to the alleged marriage contract, the answer set forth that the defendants had never heard of the same, or that any marriage contract whatever had been executed, until the year 1819, when the alleged existence of such a contract first became generally known in connection with a bill in equity filed by the said Cochran and his wife, the complainant, against Hugh Gemmill and John Stoops, in which bill a marriage contract between said Cochran and the complainant was alleged to have been executed. That the execution of such a contract was not generally known at the time of the intermarriage, but on the contrary the same was studiously concealed until the filing of the bill in equity against Gemmill and Stoops. That in consequence of such concealment the said Cochran was supposed to have acquired by the marriage considerable property, and that he thereby gained an extensive credit. And the defendants alleged that it was in consequence of the credit so acquired, and of their ignorance of the existence of any marriage contract as is now set up, that they were induced to become the sureties of the said Cochran in the recognizance entered into by him as trustee for

Sarah Armitage,—and which they were obliged afterwards to pay.—The answer denied that the complainant had, subsequent to the marriage, held and enjoyed any separate and exclusive use or estate in the property in controversy; but, on the contrary, it alleged that Joseph W. Cochran, the husband, had from the time of the intermarriage held and possessed the said property, receiving the rents, profits and income thereof, and acting in all respects as the owner of the same, without interference by the complainant, until within a year of the bringing of this suit, when the complainant filed a bill in equity against the said Cochran, in which she claimed for the first time a separate estate in the said property, and sought to restrain her said husband from further control over the same; and the answer insisted that the concealment of the marriage contract, if any such in fact existed, and the possession by the said Cochran of the property in controversy operated as a fraud upon the defendants, who were the creditors of the said Cochran, and should, in equity, protect them from the claim now set up under the alleged contract.

Other defences were taken in the argument at the bar, and were considered at large by the Chancellor, which do not appear in the answer on file,—particularly, the ground, strongly relied upon, that the marriage contract was invalid for the want of a trustee for the wife appointed in it; and also the defence founded upon proof, as hereinafter is stated, that the complainant had on one occasion pretended to destroy the marriage contract.

Issues were joined and depositions taken by both parties. It was proved that a few days prior to the marriage of Cochran to the complainant, to wit, on the 20th of January 1808, a marriage contract in writing was signed and sealed by him alone; that several persons then knew of it, but it was not generally known; that afterwards, in the year 1811, the mother of Cochran becoming dissatisfied with the contract, the complainant, in order to pacify her, pre-

tended to destroy it by folding up a piece of paper, similar in appearance, and throwing it into the fire. All present, except the complainant, supposed it was burnt. This was not done with the previous knowledge of the husband. It was proved that Cochran, the husband, had always recognized the separate interest of his wife, and that in April, 1819, he had joined her in a bill to restrain one of his creditors, Hugh Gemmill, from proceeding, under an execution against him, to take the goods and furniture secured to her by the marriage contract. It was further in evidence that at the date of the marriage contract Cochran was not in debt; that then and for some time afterwards he was in good credit; that he had been accepted by the Court of Common Pleas and by the Orphans' Court, as surety for other persons, in several instances and for large amounts; that he had since become dissipated and insolvent, and his property had all been sold by the Sheriff. A bill in equity had been filed by the complainant, on the 9th of September 1820, to restrain him from future interference with her rents.

The marriage contract was in the words following;

" These articles of agreement, made and concluded the " 20th of January 1808, shall and are by the parties intended " ever to witness, that, in consideration of and preparatory " to a marriage contemplated to be had and solemnized " between Joseph W. Cochran, male, of the one part and " Frances L. Lewis, female, widow of Philip Lewis, Esq., " deceased, of the other part, both of the county of New , " Castle and State of Delaware, she the aforesaid Frances " L. Lewis, hath demanded and covenanted with, and he " the said Joseph W. Cochran, doth agree to, and by these " presents hath formally and solemnly covenanted, that the " aforesaid Frances L. Lewis, shall and may, after the " intended marriage has been solemnized, as though it " never had taken place, be at full and perfect liberty,

" without coercion or prohibition from him, to retain, use,
" or convey, or in any manner she thinks proper dispose
" of, all or any part of her property and estate, either real
" or personal. which may or in any wise can be supposed
" or considered as belonging to her, at the date and time
" of the aforesaid marriage, as well as a constant and con-
" tinued privilege and legal power to collect, raise, and
" apply to her own particular purposes, and as her own
" inclination or pleasure may incline or direct, all and
" every part of the rents, profits, or advantages arising, or
" which in any way may arise, from the aforesaid property;
" by which means I do hereby renounce, disclaim, and
" forego all profits or advantages, which custom or the
" laws of this State might otherwise allow me, giving and
" granting to her, the aforesaid Frances L. Lewis, in addi-
" tion to the privileges herein before mentioned, that of
" an uncontested right and power of making and bequeath-
" ing by will, at her death, to whomsoever she pleases, all
" or any part of her property aforesaid, both real and
" personal, which at that time may be in her possession,
" and the same to be enjoyed and possessed by her legatees
" or legatee, in conformity to the letter and sense of her
" last will and testament, immediately after her decease,
" uninterrupted or undisturbed, in any way whatsoever,
" by any interference or pretensions of him the aforesaid
" Joseph. W. Cochran, contrary to the letter of the will of
" Frances L. Lewis aforesaid, or contrary in any way to
" the intention or expressions of these articles and cove-
" nants herein before mentioned and subscribed to.   And
" for the true, faithful and religious performance of, and
" adherence to the above mentioned covenants and agree-
" ments, I, the aforesaid Joseph W. Cochran, have hereunto
" set my seal, accompanied with my friend,——,of the
" County and State aforesaid.   Both of us jointly, and each
" of us separately, do consider and hereby acknowledge our
" heirs, executors, or administrators, bound and firmly

" held to the aforesaid Frances L. Lewis, or her legal
" representatives, in the penal sum of five thousand dollars,
" to be demanded, levied, and raised by a legal and speedy
" process, in case of non-adherence to the aforesaid articles
" and agreements in every item, from any goods or chattels
" which we, or either of us, may be found to possess, and
" which in its full extent to be applied to the immediate
" use of the aforesaid Frances L. Lewis, or her heirs or
" assignees, &c.  In consent, acknowledgment and witness
" to which we have each of us hereunto set our hands and
" affixed our seals this day and date before within written."

*Signed, Sealed and delivered*
*in presence of*

(Signed,)                           (Signed,)
  FRANCIS BURK,              JOS. W. COCHRAN. { L. S. }
  JOHN T. COCHRAN.

The cause came before the Chancellor at the April Term,
1822, for a final hearing upon the bill, answer, exhibits
and depositions.

*Van Dyke,* for the complainant.

Marriage is a consideration sufficient to support the con-
tract.    It is a consideration highly favored in equity.    The
Courts have gone further to sustain marriage contracts
than the present case requires,—holding that even *executory*
contracts for a settlement upon the wife should be enforced.
2 *T. R.* 684, 695 : 1 *Wilson's Bac. Abr.* 507, *Baron and
Feme,* (*M.*) : 5 *T. R.* 381 : 2 *P. Wms.* 243.    The appoint-
ment of a trustee was not necessary to the validity of
this contract, there being no creditors at the time it was en-
tered into.    There are numerous authorities to this point;
4 *Woodeson's Lect. part* 3rd *pp.* 443–4 : 2 *Ventris* 343, *Haymer
vs. Haymer* : *Reeves' Dom. Rel.* 162–3–4, and cases there
cited.    It has been held that even articles after mar-
riage, though voluntary, are good against all who were not

creditors at the the time, if the husband were then solvent. *Ambler* 121 ; *Chanc. Cases* 92.    It is not material in this case that the goods,after the marriage,came into the possession of the husband and so remained ; because such possession was consistent with the trust.    From necessity, the personal property must, during the coverture, remain in the joint possession of husband and wife.    Such possession is no badge of fraud.    *Cowper* 436.    It may be argued that the possession of the goods gave the husband a false credit, and deceived persons who contracted with him.    The answer is, that the contract was not fraudulent—nor was the possession of the goods by the husband,—that the law secures to the wife the benefit of the contract, and she cannot be deprived of it by the fact that persons afterwards contracted with the husband.    The trust attached before the defendants had any claim, and having once attached they cannot defeat it.    Again, the absence of any inventory of the goods and furniture is wholly immaterial.    An inventory serves for the better identifying of the goods, but they may be identified by any other sufficient evidence. The identity of the goods in the present case is not in controversy.    *Campion vs. Cotton,* 17 *Ves. Jr.* 264, covers this case in all points.    There, it was held that the consideration of marriage will support a settlement, even of personal effects, against creditors of the husband, and that neither the joint possession of furniture, nor the want of an inventory, nor the fact that the settler was indebted at the time and that his wife knew it, will affect the settlement.

*Black, Rogers and Read, Jr.,* for the defendants.

We might object to the article as not being sufficiently executed.    Mrs. Cochran was not a party and no delivery was proved.    But, waiving all objections of form only, we pass to the defences taken upon the merits.    These are four, viz :

1. The article was secretly executed and studiously concealed, from its date in 1808 until 1819; and then it was brought to light in consequence of Gemmill's execution against the goods and furniture. No witnesses outside of the family had any knowledge of it prior to the year 1819; or, if any had such knowledge, it was only gathered from conversations within the family circle. Such a contract, affecting as it did the rights of Cochran's creditors and disappointing their just expectations, ought to have been recorded, and notice to the world thus given. In England, marriage settlements are by statute required to be registered. Our law does not require them to be recorded; but the omission to record, connected with a studious concealment, goes strongly to the question of fraudulent intent. It was well understood, that Cochran married the complainant for her money, and it was supposed that he got it. As a consequence, he received a false credit, whereby the defendants have been injured. The material question is, whether, admitting the articles to be effectual as between Cochran and his wife, she stands in such an equity, that this Court will, at her instance, interfere against the legal rights of the creditors? The position of the defendants is further strengthened by the fact that they were sureties, who have paid their money for the husband without any consideration to them.

2. The contract, even if originally valid, was abandoned. Cochran was permitted to deal with the property as his own. The complainant has herself, by her bill against Cochran in 1820, confirmed the testimony on this point,— alleging, as she there did, that he had taken the rents. Besides this, he received the money paid by the executor of her deceased husband, Doctor Evans. She also permitted him, without objection, to sell two of her houses. It was not, as has been argued, a case of *joint* possession. He separately took the rents, and dealt with the property as his own, whereby his creditors were misled. All this

was done with her permission. She caused the evil and should herself bear it. A party enabling another to commit a fraud is answerable for it. 1 *Madd. Ch. Pr.* 256. Coverture is no excuse for drawing in an innocent person; not even is infancy. 1 *Fonblanque's Eq.* 71 : 2 *Eq. Cas. Abr.* 188–9.

3. The complainant pretended to burn the contract, in the presence of Cochran's family, in 1811 ; and her subsequently claiming under it was a fraud. By pretending to destroy it she gave out to the world that her claim under it was extinguished and her husband's marital rights revived. Whatever notoriety the contract may have previously possessed she thus put an end to. Her act was an open fraud, and the doctrine is that once a fraud always a fraud. In 2 *Eq. Cas. Abr.* 478, a brother gave to his sister, who was about to be married, £150. She executed a bond to repay the money, and then married. The husband died. Though it was her own agreement she was relieved from the bond, because it was a fraud on the husband.

4. The want of a trustee for the wife under the marriage contract is fatal to its validity, as against the husband's creditors, however it might be valid as between the husband and wife. The legal estate, being left to vest in the husband, became liable at law to execution against him. The wife's interest under the contract was but an equity. We also have an equity as creditors and sureties,—an equity superior to the wife's ; and we are therefore entitled to hold our advantage at law. Were the equities but equal, even then our legal right must prevail. Hence, in all cases where creditors are concerned the intervention of trustees is necessary. In the cases cited for the complainant, either the claim set up was by the wife against the husband or his heirs; as in 2 *Ventris* 243 : 2 *T. R.* 684 : and 2 *P. Wms.* 243 : or, the trust was created by a devise to the wife, which may be supported without a trustee ; as in 1 *Madd. Ch. Pr.* 376–7, and in the cases cited from

*Woodeson* and *Reeves.* In *Campion vs. Cotton,* cited from **17** *Ves. Jr.* 264, we apprehend there were trustees    There is no case in which the husband has been permitted, without the intervention of trustees, to divest himself of the title to his wife's property, so as to defeat creditors.    It has been held in some cases that, even as against the heirs at law of the husband, an agreement before marriage for a settlement is not good without trustees.    2 *Ves. Sr.* 190 : *Ambler* 467, 468.

*Read,* for the complainant, in reply—

This is not an executory agreement, nor have we come into court for a specific performance.   It is an executed agreement, which by its own terms fixes the rights of the parties.   It seemed to be conceded in argument that such an article is competent to secure personal property, but that it is not sufficient as to real estate without a trustee. Now, one of the settled principles of equity is, that a trust shall never fail for the want of a trustee.   The Court itself, if necessary, will become the trustee.   Equity looks only to the substance and merit of the agreement and not to the form.   If there be a consideration, the Court will supply all needful form.   Marriage *is* a consideration,—one the most favored.   17 *Ves. Jr.* 262–3–4 :  2 *P. Wms.* 243 : *Ambler* 565 : 1 *Madd. Ch. Pr.* 371.

Next,—the contract, if valid in equity, as to its form, is not impeachable for fraud in its original purpose. There were, when it was entered into, none to be defrauded by it,—no creditor, children, nor .heirs at law.   It is argued that there was concealment.   This is not true in point of fact, but were it even so, concealment is· no evidence of fraud, to impeach the agreement, unless there were an obligation on the parties to make it public.   Our law, however, does not require publicity.   No record of marriage settlements nor any form of notoriety· is required.

They are treated as matters which concern the family and not the public.

Again,—to all efforts to impeach this agreement by the subsequent acts of the parties, there is one answer. A contract of this sort, once made and valid, is indestructible by any after conduct of the party. The wife may permit another to take her rents, and so for the time may deprive herself of them : but she cannot by such conduct invalidate the agreement itself, or her future rights under it. The act chiefly relied on in argument, viz : the pretended burning of the contract, was no fraud, such as to affect the contract. It had no fraudulent purpose, being done merely to restore the peace of the family. It deceived no one but the mother-in-law, who had no right or claim under the contract.

RIDGELY, CHANCELLOR.—The great point in this cause arises on the effect of the contract, and how far it can be enforced in this Court, against creditors of the husband, at the suit of the wife, in the life time of the husband and wife. The principal objection is the want of a trustee on behalf of the wife, and because the right or estate in the goods and furniture, real estate and the rents, and the interest of £400,—all being the property devised to her by Doctor Thomas Evans, and also her dower in the estate of Philip Lewis, had not been conveyed to a trustee but remained in her at the time of the marriage.

This is not a question between the wife and the heir of a husband, nor between the husband and the heir of a wife, nor whether a wife by a will made before or after marriage can devise real estate in the life time of her husband, the legal estate being in her, in pursuance of an agreement to that effect, but the question is, whether this Court will secure to a wife, against the husband and his creditors, the benefit of a contract made by the husband with her before marriage, in consideration of marriage, by

which he agreed that she should have to her separate use, to dispose of at her pleasure, her whole personal and real estate.

The case first cited for the complainant, is *Haymer vs. Haymer*, 2 *Vent.* 343. There the husband, by articles entered into by him with his wife before marriage, agreed to settle certain lands, before the marriage should be solemnized, on him and his intended wife and the heirs of his body by the plaintiff, but died before the settlement. The marriage was celebrated, and after his decease she exhibited her bill against the heir at law of the husband, and it was decreed against him. Here, it was objected that the marriage was a waiver of the articles, and that the contract not being made with a trustee. on behalf of the wife the marriage before the settlement operated as a release in law. The case cited is not important. It merely shews that the contract was enforced, although the agreement was made without a trustee.

*Cannel vs. Buckle*, 2 *P. Wms.* 242, cited also by the complainant's counsel, is similar to *Haymer vs. Haymer*, with this difference, that in *Cannel vs. Buckle*, the intended wife agreed with her intended husband to convey her lands to the husband and his heirs, and before the marriage gave bond accordingly. After the death of both, the heirs of the husband brought a bill against the heirs of the wife, and Lord Chancellor Macclesfield said, that " the impro- " priety of the security, viz., a bond from a woman to a " man whom she intended to marry, or the inaccurate " wording of such bond, is not material ; for it is sufficient " that the bond is a written evidence of the agreement of " the parties ; that the *feme*, in consideration of marriage, " agrees the man shall have the land as her portion ; and " this agreement, being upon a valuable consideration, " shall be executed in equity. It is unreasonable that the " marriage, upon which the bond is to take effect, should " itself be a destruction of the bond ; and the foundation of

" that notion is that, in law, the husband and wife being
" one person, the husband cannot sue the wife upon this
" agreement, whereas, in equity, it is the constant experi-
" ence that the husband may sue the wife, or the wife the
" husband ; and the husband might sue the wife upon this
" very agreement in the principal case."

These cases, and many others to be found in the books, establish these positions, that in equity the form of the agreement, so that it is in writing, is not material ; that marriage is a valuable consideration, and that the husband and wife may, in equity, sue each other and compel the execution of such a contract. Here I will remark, that if a woman marries on the faith of an agreement made to secure to her the separate enjoyment of her own estate, and that agreement is not performed, and she cannot enforce it, she is notoriously wronged and the laws are deficient in justice. She cannot be unmarried and return to her former condition, and can in no way be compensated ; and, therefore, justice requires that she should be able to obtain all the advantages promised to her by the husband when he undertook to yield to her his marital rights, or some of them, to induce her to become his wife. Such contracts are prudent, and if they were oftener made the happiness and safety of wives and of their children would reward them for their foresight and caution.

The opinion of Lord Hardwicke in the case of *Peacock vs. Monk*, 2 *Vesey Sr.*, 190, cited by the defendants' counsel, is supposed to bear hard on the complainant's pretensions ; but even that opinion, as to the present subject of controversy, if not in express terms yet by clear inference will justify a decree in her favor. We must keep in mind that the only property here in dispute consists of the furniture and goods which she possessed at the time of her marriage, the rents and interest of £400 devised to her by Doctor Thomas Evans, and the rents of her dower in the real estate of Philip Lewis, over all which he had full power during

their joint lives. There is no question about any estate. of inheritance in land nor about the validity of a will of a *feme covert.* Were either Cochran or the complainant to die there would be an end of all interest in Cochran and in his creditors (putting this agreement totally out of sight) in all future rents and in the interest of the £400. Lord Hardwicke's opinion arose concerning lands held in fee-simple by the wife. In that case it is to be collected that his opinion was formed on a supposed case of this kind. A woman having a real estate before marriage, in consideration of that marriage, entered into an agreement with her husband that she might by writing, under her hand and seal, executed in the presence of witnesses, or by will, dispose of her real estate, there being no trustee, that is, the legal estate not being conveyed to a trustee but remaining in the wife. The question was whether it would pass by her will, she being a *feme covert* at the making of it and at the time of her death. Lord Hardwicke said that her real estate would descend to her heir at law, but that she might dispose of it by a proper conveyance ( by fine, if a married woman) by way of trust, or of a power over an use; as, in the first instance, supposing her to be a *feme sole,* she may convey it to trustees in trust for herself during coverture for her separate use, and afterward in trust for such persons as she should by writing, under her hand and seal, or in nature of a will, appoint Then if she marries and makes such appointment, that would be a good declaration of the trust,—one which the Court would support. So, she might do it by way of power over an use; as, if she conveyed her estate to the use of herself for life, remainder to the use of such persons as she by writing, &c. should appoint,— this is a power reserved to her, and it has been determined that a *feme covert* can execute a power. But then Lord Hardwicke asks, " can a *feme covert* do this, so as to bar " her heir, by a bare agreement, without doing anything " to alter the nature of the estate ? Can a woman, having

" a real estate before marriage, in consideration of that
" marriage, enter into an agreement with her husband,
" that she may by writing under her hand executed in the
" presence of witnesses, or by will, dispose of her real
" estate ? This rests in agreement,and if she does it, though
" it may bind her husband from being tenant by the
" curtesy, that arises from his own agreement ; but what
" is that to the heir ?   Still, she is a *feme* under the disa-
" bility of coverture at the time of the act done, and if
" she attempts to make a will the instrument is invalid.
" The only question that could arise would be, whether
" such an agreement between her and her husband would
" not give her a right to come into a court of equity, after
" the marriage, to compel the husband to carry this into
" execution and to join with her in a fine to settle the
" estate, either on such trusts or to such and such uses.
" And if it is such an agreement as the Court would decree
" to be further carried into execution by a proper convey-
" ance, then the question may be whether her heir at law
" is not to be bound by the consequences of that agreement ?
" That is the only way by which it could be brought in.
" But if the agreement cannot be carried into execution,
" though she might have power to bar her husband, it
" being a voluntary claim from her, and the law casting
" the descent on her heir at law, I very much doubt how
" it could be done." Now, in this case put by Lord
Hardwicke in relation to the real estate, he admits that by
such an agreement the husband may be bound from being
tenant by the curtesy, which arises from his own agree-
ment, and that if the agreement could not be carried into
execution as to the heir, still she might have power to bar
her husband.   And if so, in the supposed case, why may
not Cochran be bound by his own agreement not to take
the rents devised to her and the rents of her dower in
Lewis' estate ?  She herself has only an interest for life,
and this agreement cannot possibly relate to or affect an

heir. It does not concern an estate of inheritance, and as the husband may by his agreement bar himself from being tenant by the curtesy, I conclude, without a doubt, that he may bar himself from this interest of the wife in the real estate of Doctor Thomas Evans and Philip Lewis. In the preceding part of the case of *Peacock vs. Monk*, Lord Hardwicke says, " as to personal, undoubtedly,where there " is an agreement between the husband and wife before mar- " riage that the wife shall have to her separate use, either " the whole or particular parts, she may dispose of it by " act in her life or by will. She may do it by either, " though nothing is said of the manner of disposing of it, " but there is much stronger ground in that case than can " be in the case of real estate, because that is to take effect " during the life of the husband ; for if the husband sur- " vives he is entitled to the whole and none can come into " a share with the husband under the Statute of Distribu- " tions. Then, such an agreement binds and bars the " husband, and consequently bars everybody." The doctrine in this case directly applies to the present bill. This whole agreement is to take effect in Joseph W. Cochran's life time. As to the rents and interest of the £400, the death of himself, or of his wife, would terminate his interest' in them, and nobody could controvert his right to the goods, so that his agreement could affect nobody but himself, and, upon this reasoning of Lord Hardwicke, *Peacock vs. Monk* is a clear authority. It is decisive of the question between these parties. Nothing is comprehended in the contract now in controversy but such as Cochran might absolutely relinquish to the wife without affecting any other person and, therefore, in the words of Lord Hardwicke, the " agreement binds and bars the husband and conse- " quently bars everybody."

In *Harvey vs. Harvey*, 1 *P. Wms.* 125, there was a devise of personal estate to a *feme covert* for her separate use without naming trustees. Lord Cowper said it was a great

question whether the husband should be compelled to let the wife enjoy this personal estate to her own use, for it being given to a married woman,and no contract precedent or subsequent from the husband that he will not intermeddle with it, the " husband's title to this estate is sub-" sequent to the will and the intention being repugnant to " the rules of law, viz : that a *feme covert* should have a " property in personal goods, it seems to me to have some " difficulty in it. Wherefore, let it be reserved as a case " to be argued. But as to the mortgage,where the husband " has contracted or declared under his hand that he would " not intermeddle with it, though such declaration may " be voluntary yet it must be presumed to proceed from a " sense the husband had of the testator's intent that the " wife should enjoy this mortgage separately, and to be " founded on natural justice though not on contract." For which reason the Court was clearly of opinion that the husband should be bound by this agreement. Here there was no doubt with the Chancellor as to the mortgage, part of the personal estate bequeathed to the wife, because he had agreed by writing under his hand that the wife should enjoy it to her separate use. But the Chancellor said that " if a real estate were devised to a *feme covert* for " her separate use, and a declaration that the husband " should not intermeddle with the profits, but that the " wife should enjoy them separately, he doubted this would " be a repugnant clause and the husband would still enjoy " it." Mr. Cox, in his note to this case, says that it does not appear by this report, or by that of 2 *Vernon*, 659, nor even in the Registers' Book, what was Lord Cowper's final determination on this point ( as to the real estate) : but the case of *Bennet vs. Davis*, which was determined at the Rolls in December, 1725, seems to have settled it. But even in *Harvey vs. Harvey*, as to the personal estate and the mortgage the Chancellor had no doubt and, therefore, it opposes no difficulty to the claim of the complainant in the present cause.

even in *Harvey vs. Harvey,* as to the personal estate and the mortgage, the Chancellor had no doubt, and therefore it opposes no difficulty to the claim of the complainant in the present cause.

The case of *Bennet vs. Davis,* 2 *P. Wms.* 316, is material as to the question of trustees and in relation to creditors. There, the testator devised lands which he held in fee to his daughter, the wife of Bennet, for her separate use, exclusive of the husband, to her and her heirs, and that the husband should not be tenant by the curtesy, nor have these lands for his life in case he survived his wife, but that they should, upon the wife's death, go to her heirs. The husband becoming a bankrupt, the commissioners assigned the lands thus devised to the defendant, Davis, in trust for the creditors, and upon Davis bringing his ejectment the bankrupt's wife, by her next friend, preferred her bill against Davis, the assignee, and her husband, to compel them to assign over this estate to her separate use. The Master of the Rolls took it to be a clear case, that it was a trust in the husband, and that there was no difference whether the trust was created by the act of the party or was, as here, by the act of the law. "If," he says, "I should devise that my lands should be charged with debts or legacies my heir, taking such land by descent, would be but a trustee, and no remedy would lie for these debts or legacies but in equity. So, in the principal case there being an apparent intention and express declaration that the wife should enjoy these lands to her separate use, by that means the husband, who would otherwise be entitled to take the profits in his own right during the coverture, is now debarred and made a trustee for his wife. And admitting the husband to be a trustee, then the argument of the creditors having the law on their side was immaterial ; as if the bankrupt had been a trustee for J. S. his bankruptcy should not, in equity, affect the trust estate, and that in this case though the husband, the bankrupt, might be ten-

ant by the curtesy, yet he should be but trustee for the heirs of the wife. Also, when the testator had a power to devise the premises to trustees for the separate use of the wife, this Court, in compliance with his declared intention, will supply the want of them, and make the husband trustee; and the defendant, the assignee, who claiming under the husband can have no better right than the husband, must join in the conveyance to a trustee for the separate use of the wife,"—which was decreed accordingly. See also *Lee vs. Priaux*, 3 *Bro. Ch. Rep.* 381.

I have been more particular in quoting at large the opinions of Lord Cowper and of the Master of the Rolls, in the two cases cited from Peere Williams, because the defendants' counsel have insisted that in cases of contract between the husband and the wife, by which the husband agrees that the wife shall hold the property to her separate use, trustees are indispensably necessary, and that when the creditors have gained a legal advantage, or have the law on their side, and have a superior equity, there being no trustee, they must prevail. The first case *Harvey vs. Harvey*, shows expressly that Lord Cowper had no doubt, where the husband had agreed by writing under his hand that the wife should have the mortgage to her separate use, that trustees were not necessary; not because it was the case of a devise, but because the husband had made a contract. And in *Bennet vs. Davis*, the Master of the Rolls took it to be a clear case that it was a trust in the husband and that there was no difference whether the trust was created by the act of the party or by the act of law.

In *Mitchell vs. Mitchell*, cited in 2 *Eq. Ca. Abr.* 26, c. 29, there was a gift by the husband to the wife, without the intervention of trustees, and it was held good. So in *Rolfe vs. Budder*, *Bunb.* 187 : 1 *Eq. Ca. Ab.* 153, c. 17, a devise of a bond to a wife, for her sole and separate use, was held to give her the bond to her sole use as much as if it had been vested in trustees. And in *Moore vs. Freeman*, *Bunb.* 205 :

2 *Eq. Ca. Ab.* 26, *c.* 29, articles of agreement between husband and wife were held binding in equity, without the intervention of trustees.   In truth, there is no reason for the distinction ; for if the devise or gift or agreement is made without a trustee, by one who has a power over the subject matter, he in whom the legal interest remains will be held a trustee, whether husband or any body else ; for it is the intention of the parties and not the form which, in equity, gives essence to the contract.   See *Darly vs. Darly*, 3 *Atk.* 399, where a husband was held to be a trustee for the wife. Also, in 5 *T. R.* 386, Lord Kenyon says, this is the constant, uniform practice of the Court of Chancery.   Many other cases have been cited in the argument, which carry the doctrine much beyond what is necessary to support this marriage contract.   The importance of the subject, the novelty of the case, and my respect for the gentlemen concerned for the parties, induce me to examine all the authorities, although those already discussed are sufficient to establish the validity of this contract.

In *Bramhall vs. Hall, Ambler* 467, articles were entered into by which George Bramhall covenanted that his intended wife should have power, by deed or will, to dispose of her estate after her decease to any person whatsoever, and that he would do any act to confirm the same. After marriage she conveyed it, by lease and release to take effect after her death, to trustees, to the use of her natural son, with remainder over, but afterwards joined with her husband to levy a fine to different uses.   Lord Chancellor Northington held, that the wife having the legal estate in her, the lease and release were not good to pass her estate as a conveyance or execution of a power, and that it passed by the fine.   From this short note of the case it would seem that Lord Northington fell into the opinion of Lord Hardwicke, and that because the wife had not, before or after the marriage, parted with the legal estate to trustees, in trust to her separate use during coverture

and then in trust for such person as she should by deed appoint, that this conveyance by lease and release could not be sustained—or, in other words, that the legal estate still remaining in her, she could not dispose of the estate according to the agreement, but that it must be done by fine, according to the form required for a married woman. But in the next case, *Wright vs. Englefield, Ambler* 468, he said that in *Bramhall vs. Hall,* he was of opinion there was no meritorious consideration. If then there had been a meritorious consideration, it may be presumed that the conveyance by lease and release, being a deed according to the covenant by the husband to the wife, would have been supported. So that the ground of the decision appears to be, not that the wife had not parted with the legal estate, but that it was not a proper case for a court of equity to enforce. This, I think, is the clear inference from what can be collected from the case.

The case of *Wright vs. Englefield, Ambler,* 468, was this. Marriage articles were entered into by Peter Holford, of the one part, Constantia Wright, widow, of the other part, and Smith and Bramston, of the third part, whereby, after reciting the intended marriage and mentioning the various kinds of estates and interests of the wife, it was agreed that they should be to her separate use, and be applied and disposed of, from time to time, as she should, by any deed or deeds executed in her life-time, or by her last will and testament, appoint notwithstanding her coverture. Holford, the intended husband, covenanted with Smith and Bramston, that he would do all acts, deeds, &c., for vesting all such estates and interests in such person or persons as she should appoint, in trust for her sole and separate use, and to be subject to such disposition as she should make thereof, by any act or deed or by her last will and testament. The legal estate in the real property was by a previous settlement vested in trustees, and Constantia, the wife of Holford, was entitled to a moiety of the trust inheritance.

27

By her will, made during the marriage, she devised her moiety of these premises, by virtue of the power reserved to her by the said articles, to trustees, to the use of her husband for life and then to trustees for five hundred years to raise portions for the younger children by Holford, with several remainders over. A bill was filed by Wright, her eldest son and heir at law, and one of the questions was whether the appointment by Mrs Holford's will was good. Lord Chancellor Northington was of opinion that the appointment by her will was good. It was held in this case that if a woman before marriage retains a power over a legal estate, to be exercised by way of execution of a power, she may do it, and that the construction of trusts must be the same as of legal estates. And Lord Camden says, in *Rippon vs. Dawding, Ambler* 565, that the principle of determination is the same in both, as it certainly is. This case of *Wright vs. Englefield*, was carried into the House of Lords, where it was decided that articles executory will bind the heir as much as a conveyance executed. This then is a decision against the opinion of Lord Hardwicke in *Peacock vs. Monk.* And it is to be remarked that the wife herself had done no act, either before or after her marriage with Holford, so as to convey her estate or reserve any power, but that the whole vested on the articles entered into before her marriage. The legal estate, it is true, was not in her, but then trusts are to be construed the same as legal estates; and Lord Northington says, no rule is so strictly adhered to in equity and so dangerous to depart from as that the construction of trusts must be the same as of legal estates.

*Rippon vs. Dawding, Ambler* 565, was not a trust estate. The wife was seised of a freehold estate, and previous to her marriage with Deeping, her second husband, he entered into a bond with a condition empowering her to dispose of her freehold estate, by deed or will, notwithstanding her coverture. The wife afterwards, by will made during her

coverture, gave her estate in fee to her younger children. The eldest son being dead and leaving a daughter, his only child, the younger children filed a bill against this daughter to have a conveyance. A conveyance was decreed. Lord Camden said the agreement was made on marriage, and the wife might have compelled the husband to join with her in a fine. " Though " he says "the two cases (this and *Wright vs. Englefield*,) differ in respect that the wife had only an equitable interest in one and the legal interest in the other, yet the principle of determination is the same in both. Equity follows the law; and as the Court decreed performance of the agreement in *Wright vs. Cadogan, et al.* (the same case as *Wright vs. Englefield*, but in the House of Lords called *Wright vs. Cadogan, et al.*) which was a trust interest, it will do so in this, which is the case of a legal interest."

These cases in Ambler seem to have settled the point which Lord Hardwicke doubted, especially as *Wright vs. Englefield*, alias *Cadogan*, was carried into the House of Lords and there solemnly decided. As it, then, has been finally adjudged that the will of a married woman, although she did not part with the legal estate, is valid and may be executed so that the estate shall be conveyed accordingly, being made in pursuance of a previous written marriage contract, *a fortiori*, this marriage contract is available and ought to be enforced.

*George, on the demise of Thornbury, vs. ——,Ambler*, 627, is a case at law, where the will of a married woman, devising lands of inheritance in pursuance of articles entered into previous to the marriage, was adjudged not to be valid. The Court said, "we must determine according to the strict " rules of law, but courts of equity can go further than we can." The Court further said, that a husband could not give a wife power to make a will of lands in prejudice of the heir at law. This case is perfectly correct; for it was a question of law decided in a court of law; but then it

was admitted that a court of equity could go further than a court of law, as all the before cited cases demonstrate.

*Doe vs. Steple* 2 *T. R.* 684, was a case at law. Before marriage there was an agreement, not sealed but signed by the parties, that the fortune of Catharine Culver, the wife, should be settled or remain to their joint use for her life, or the life of the survivor, and if she should survive the said James Hibbins, the husband, then her whole fortune, together with her plate and jewels, to be settled to her own use ; and if the said Catharine Culver should happen to die first, then the aforesaid fortune to be at her own disposal ; and proper settlement deeds were to be prepared. On the same day and year, she made her will, duly executed to pass real estate, and after giving the whole interest of her fortune to James Hibbins, her intended husband, for life, and after several specific devises in which the reversion in the premises in question was not mentioned, she devised the residue of her estate and effects to the said James Hibbins, whom she appointed executor. On the same day and year the marriage took effect, and on the 7th day of April, 1759, Catharine Culver died, without issue, in the lifetime of her husband. In the argument, the counsel for the plaintiff admitted that it might be too much to contend that Hibbins, the husband, did not take a life estate under the agreement ; for, if he took a clear equitable estate for life, the Court of Chancery might compel the plaintiff's lessor to pay costs in equity for taking a larger judgment at law than he is equitably entitled to. And Lord Kenyon, in delivering his opinion, remarking on the case of *Peacock vs. Monk,* says, "he (Lord Hardwicke) doubted whether even a court " of equity could carry into execution a bare agreement " for that purpose, to the prejudice of the heir at law. " However, that which was then considered a doubt no " longer remains so ; for in *Wright vs. Cadogan et. al.,* it " was determined that a court of equity would compel the

" heir to make a conveyance to the party in whose favor
" such an agreement was made.   That point was very ably
" discussed in the House of Lords, on the doubts which
" Lord Hardwicke had thrown out in *Peacock and Monk,*
" though his doubts were not sufficient to induce the
" House to determine against such an agreement." Thus,
Lord Kenyon adds the weight of his judgment in support
of a disposition of lands of inheritance, in pursuance of
a bare agreement, to the prejudice of the heir at law.
And if such an agreement may be carried into execution
against the heir at law, how much more certainly would a
court of equity execute against a husband his own agree-
ment, made in consideration of marriage, by which the
inheritance or the heirs at law never can be affected.

The same case afterwards, by the names of *Hodsden vs.
Lloyd,* and *Lloyd vs. Hodsden,* 2 *Bro. Ch. Rep.* 534, came
before Lord Thurlow on a bill filed by the heirs at law of
Catharine Culver, the wife, and her heirs in gavelkind,
praying an account, among other things, of the rents and
profits of the estate which came into the hands of James
Hibbins, the husband.   A cross bill prayed, among other
things, that the will of the wife, Catharine Culver, might
be declared to be well proved.   Lord Thurlow, in relation
to the agreement by which an equitable estate for life was
given to the husband, said, " the terms of the agreement
are these ;—where Catharine Culver recites her property
" to be real and personal, and agrees that her whole fortune
" so described should belong to the longest liver, that is,
" to her or her husband who should survive the other ; by
" virtue of this agreement, though there was no actual
" conveyance, the heir will hold that estate subject to the
" life interest therein of Hibbins, and consequently not as
" present possessor, but as seised of the legal interest in
" the estate for Hibbins.   I think under these circum-
" stances the plaintiffs are entitled to the account only
" from the time of Hibbins' death, who, being the equita-

" ble tenant for life, was entitled to the rents and profits
" during his life." As to the will of the wife, the Lord
Chancellor was of opinion, that the will, being made before
the marriage, was not a will according to the power;
because the power to make a will after marriage could
not be held a power to make a will antecedent to it. In
speaking generally whether a *feme covert* can make a will
to pass real estate in pursuance of the agreement of the
husband, he said, " with regard to chattels, both real and
" personal, the husband, by contract anterior to the mar-
" riage, resting only in agreement, could authorize her to
" make a will; but in order to make a will of real estate
" he must part with the legal estate to trustees, for by
" agreement,—while resting in agreement only,—he cannot
" bind the heir, but can only bind himself, and the legal
" estate ought to be conveyed by legal conveyances." In
this latter point, Lord Thurlow certainly accords with
Lord Hardwicke in the case of *Peacock vs. Monk*, and dis-
sents from the opinions of Lord Northington, Lord Cam-
den and Lord Kenyon, and also from the decision of the
House of Lords in the case of *Wright vs. Cadogan, et al.*
Chancellor Kent, of New York, thinks that there is a mis-
take in this part of the report; but whether it is so or not,
it is not material in the case before us ; for Lord Thurlow
agrees with Lord Hardwicke and the other Chancellors,
and with Lord Kenyon, that a man may, by an agreement
made with his wife before marriage, bind himself; so that
his opinion upon the question arising under this contract
of Joseph W. Cochran and the complainant confirms all
the preceding authorities. This case of *Hodsden vs. Lloyd*
is extremely strong in support of Frances L. Cochran's
claim under her marriage contract, because, in that case,
the title of Hibbins, the husband, rested on the agreement
only. No actual conveyance had been made, and yet the
Chancellor considered that the heir would hold the estate
subject to the life interest of Hibbins, not as present pos-

sessor but as seised of the legal interest in the estate for Hibbins. This was giving full effect to the agreement so far as the life interest trenched upon the inheritance, and carried the doctrine as applicable to this case as far as any of the preceding decisions or opinions. It may be observed that in this case, and in *Rippon vs. Dawding*, and in others, there was no trustee for the wife and no conveyance of the estate to trustees subject to the will or disposition of the wife, and no objection was made on that account.

The case of *Compton vs. Collinson*, 2 *Bro. Ch. Rep.* 377, arose on a surrender of a copyhold by a *feme covert* having a power under articles of separation to dispose of her estate, the husband not having joined in the surrender. The question was whether without any custom the surrender was good. Buller, J. who sat for the Lord Chancellor, said it was a legal question, and had a case made and sent to the Court of Common Pleas for their opinion. He observed that, as to any interest of the husband, he has formally abandoned it, and does not now insist on or pretend to have any. Besides, after the husband's covenant this must be taken to be a surrender with his assent. So that Justice Buller held the husband to be so bound by his covenant as not to have any interest in this estate of his wife.

The case of *Fettiplace vs. Gorges*, 3 *Bro. Ch. Rep.* 8, corresponds with all the other cases, so far as it goes, but it has little bearing on this suit.

The last English case upon this subject, to which I shall refer, is *Campion vs. Cotton*, 17 *Vesey, Jr.* 264, where a settlement in consideration of marriage was sustained against creditors, notwithstanding false recitals that the property was the wife's; and it was adjudged that neither the joint possession of furniture, nor the want of an inventory, nor the fact that the husband was indebted at the time and that the wife knew it, would affect the settlement.

There are two American decisions, not cited at the bar, which confirm the decisions made in *Wright vs. Englefield* and *Rippon vs. Dawding*, and consequently go beyond the principles necessary to sustain this marriage contract.    One is the case of *White, lessee of Barnes, vs. Hart*, 2 *Dallas R.* 199, 1 *Yeates R.* 221.    The question there was, whether a *feme covert* seized of a real estate in fee could, in conse-quence of a power contained in articles executed between her husband and herself before their marriage (the legal estate not having been conveyed to trustees) give away such estate, by will or instrument in the nature of a will, during the coverture.    McKean, C. J.,and Shippen, Yeates and Bradford, Justices, were unanimously of opinion, that the devise of the wife, during coverture, operated as a good appointment and bound the heir at law, although the legal estate had not been vested in trustees.    The other decis-ion was made in *Bradish vs. Gibbs et al.*, 3 *Johns. Ch. Rep.* 523, by Chancellor Kent.    There the wife, before mar-riage, had entered into an agreement with her intended husband that she should have power, during the coverture, to dispose of her real estate by will, and she afterwards devised the whole  of her real estate to her husband. This was held a valid disposition of her estate  in  equity and the heirs at law of the wife were decreed to convey the legal estate to the devisee.

In  both  of these cases, and especially in the  opinion delivered by Chancellor Kent, all the English adjudications were minutely and laboriously examined, and the  result was that  the  case of *Rippon vs. Dawding* was  considered never to have been shaken ; that it is not  necessary  that the legal estate of the wife should. be  vested in trustees, and that she might dispose of her real estate in pursuance of an agreement made with her husband before marriage so as to bind the heir.    Judge Shippen at first doubted on the old distinction  between trusts and legal estates, as to the wife's power of appointment in pursuance of marriage

articles, but on more deliberate consideration his doubts were removed.

I then conclude that this marriage contract between Cochran and his wife is good, because it was made in consideration of marriage and is to take effect during the life of the husband, and because he had full and absolute power over the subject matter of the contract during the joint lives of him and his wife, and, as to the goods and furniture, forever.

The defendants have not rested this cause upon the alleged invalidity of the contract, but they say that the legal estate in this property was fixed in the husband, there being no trustee, and that it was liable to execution for his debts ; and that as they have, by their writs of execution, gained a legal advantage and have a superior equity, the Court will not deprive them of this advantage.

I have already shown, that though no trustee was named in the contract this can be no substantial objection, because the husband will be considered a trustee for her.

I have met with no case of an execution against a husband on which the goods settled on the wife to her separate use were seized ; but the cases of bankruptcy contain the principles by which this question should be decided. In those cases the assignees take by the operation of law, and the same principle should decide this case ; for it is by the operation of law that the defendants here claim.

In *Bosvil vs. Brander*, 1 *P. Wms.* 458, the following circumstances appeared.  A *feme sole*, being a mortgagee in fee, married a tradesman who became a bankrupt.  A commission of bankruptcy being taken out against him the commissioners assigned over all his estate, real and personal.  The husband, at the marriage, gave a note that the wife should have £200, part of her portion.  On the death of the husband the wife brought her bill against the assignees for the writings relative to the mortgage and to

28

have the benefit thereof.   The Master of the Rolls gave his opinion against the wife as to the mortgage, but he said, if there had been any articles before the marriage purporting that this mortgage money should continue in the wife as her provision or should be assigned in trust for her, they would have been a specific lien upon the mortgage and have preserved it from the bankruptcy.   As to the £200, the Court held that the same was specifically bound by the husband's note, and with respect to that the plaintiff was relieved and the bill as to the mortgage was dismissed.   In this case the assignees had gained a legal advantage by the assignment of the commissioners, but on a bill by the wife she was relieved to the extent of her husband's contract.

*Bennet vs. Davis*, 2 P. Wms. 316, is still stronger, because the assignees had proceeded to bring an ejectment for the land of the wife assigned to them by commissioners in the life-time of the husband, he being at law entitled to an estate for life in her lands held in fee, and having the legal estate ; and, consequently, the legal estate being vested in the assignees by the assignment.   A father had devised to his daughter, the wife of the bankrupt, lands in fee, to her separate and peculiar use exclusive of her husband, to hold the same to her and her heirs, and that the husband should not be tenant by the curtesy nor have these lands for life in case he survived the wife, but that they should go, upon her death, to her heirs.   The husband becoming bankrupt, the commissioners assigned the lands to Davis in trust for the creditors.   Davis brought an ejectment.   The bankrupt's wife, by her next friend, preferred her bill against Davis, the assignee, and her husband, in order to compel them to assign over this estate to her separate use.   The Master of the Rolls took it to be a clear case that it was a trust in the husband, and, admitting the husband to be a trustee, then the argument of the creditors having the law on their side was immaterial, as

if the bankrupt had been a trustee for J. S., his bankruptcy should not, in equity, affect the trust estate; and the defendant, the assignee, who claimed under the husband, could have no better right than the husband, and must join in a conveyance to a trustee for the separate use of the wife, which was decreed accordingly.

The counsel who argued for McBeath and Meteer made a distinction between devises to the separate use of the wife without trustees and marriage articles without trustees, but no such distinction is to be found in the books. The case of a marriage contract is stronger than a devise, because the marriage is a consideration for the contract, whereas the devise is voluntary. The case of *Bosvil vs. Brander*, as to the £200, grew out of the marriage contract without a trustee, and *Bennet vs. Davis*, was a devise without a trustee, and in both cases the wife was relieved.

In *Walker vs. Burrows,*1 *Atk.* 93–94, Lord Hardwicke lays down the law clearly that assignees under a commission of bankruptcy stand only in the place of the bankrupt, and are bound by all acts fairly done by him, notwithstanding they gain the legal estate; and this proves, he said, that assignees of bankrupts are not considered as purchasers of the legal estate for a valuable consideration for every purpose. Mr Cox, in his note to *Bosvil vs. Brander*, says that Lord Hardwicke in *Jewson vs. Moulson,* 2 *Atk.* 420, expresses great doubt whether a court of equity would interfere where the husband, or his general assignees (who stand exactly in the same situation), could get possession of the wife's property without the aid of equity; but that where the property is a subject of equitable cognizance it does not seem material whether the wife, or the husband, or his representatives or general assignees, come for the aid of the Court. He then cites the case of *Grey vs. Kentish*, 1 *Atk.* 280, where a particular assignee, that is, the assignee of the husband, took with notice of an equity in the wife, and the assignees under a commission of bankruptcy were

decreed to take subject to the same equity; and he there cites *Bushman vs. Pell,* which I have seen no where else in print, in which case Lord Thurlow declared that "where the equitable interest of the wife was transferred to the creditor of the husband by the mere operation of law, he stood exactly in the place of the husband, and was subject precisely to the same equity in respect of the wife." It is because this is a case of equitable cognizance that the Court can interfere and prevent these defendants from proceeding at law to take the separate property of the wife for the husband's debts. If this were not a proper subject for the Court,—if no sufficient ground has been shown by the plaintiff in her bill for a court of equity to interfere, then the defendants might have demurred for want of equity in the complainant's case to support the jurisdiction of the Court. But this is a case peculiarly belonging to a court of equity; and, therefore, it may afford its aid to the complainant in the same manner as if the defendants had been obliged to come into this Court to obtain the benefit of the property in dispute. Upon this principle, in *Bosvil vs. Brander,* the Court relieved the wife as to the £200 :—and so in *Bennet vs. Davis.* In both these cases the questions were subjects of equitable jurisdiction, and in both the wives were plaintiffs, seeking the aid of the Court. See *Sidney vs. Sidney,* 3 *P. Wms.* 269 : *Legard vs. Johnston,* 3 *Ves. Jr.* 352, 360.

The complainant has been charged with fraud; and the instances pressed upon the Court in support of this allegation are,—*first,* that this marriage contract was concealed until the bill in equity was filed against Gemmill in the year 1819 : and *second,* that the complainant pretended to burn it and thereby committed a fraud on old Mrs. Cochran, the mother of her husband ; and 1 *Fonb. Eq.* 161: 9 *Mod.* 38 : 2 *Eq. Ca. Ab.* 488–9. *c.* 1: 6 *Ves. Jr.* 174, *Evans vs. Bicknell,* were cited to prove that infancy and coverture were no excuses for fraud, and that if the intention

is fraudulent, though not pointing exactly to the object accomplished, yet the party is bound.

The secrecy or concealment of the marriage contract is no evidence of fraud. The complainant was not bound to proclaim or record it. There is no law nor principle requiring either. It was, as has been properly said by the complainant's counsel, a family concern, which neither she, nor any other party, was under any necessity to divulge. In England, marriage settlements and marriage contracts, as such, are not required by law to be registered or recorded. They are, as with us, kept in the pockets of the parties until some special necessity requires that they should be produced. Lord Kenyon, in the case of *Jarman vs. Woolloton,* 3 *T. R.* 618, speaking to an objection made in that case that a schedule of the goods conveyed to the separate use of the wife had not been annexed to the marriage settlement, remarks that " a schedule conveys " no information to the world. If it were annexed to the " settlement, its existence would only be known to the " parties interested in it, and therefore such a transaction " as this would be equally open to fraud, if there had " been a schedule of this furniture, as it now is." In *Campion vs. Cotton,* there was no schedule. Hence, it may be clearly inferred that it is not necessary that a marriage contract should be recorded, and if there is no law for recording it, how should it otherwise be made known ? No such objection is to be found in any of the cases upon this subject,and if such circumstance were of itself evidence of fraud, it would not have passed in silence. No case has been produced to the Court by the defendants' counsel, to support their doctrine. A purchaser from the husband of any of the goods, or a payment to him by Dr. Couper of the interest of the £400, or a payment of rents by any of the tenants, without notice, would have shielded them. In this want of notice all persons purchasing or paying Cochran would have been safe.

As to fraud in pretending to burn the marriage contract, in order to pacify old Mrs. Cochran, it may be observed that she was neither affected nor injured thereby. She was not a party to it, and could not derive the remotest benefit or advantage from it. The contract had been made without her knowledge, so far as we have any proof, and she was not in any manner concerned in it. The case of *Evans vs. Bicknell,* 6 *Ves. Jr.* 174, applies in this respect, to show that where no fraud was intended no fraud could be committed. Lord Eldon, ( p. 192,) says, " if the intention " is fraudulent in any respect, though not pointing exactly " to the object accomplished, yet he will be bound." Lord Eldon refers to Lord Thurlow's doctrine in *Beckett vs. Cordley,* 1 *Bro. Ch. Rep.* 353, where Lord Thurlow says, " there is no case in the books but where the party to " whom the fraud is imputed was cognizant of the treaty " in which the fraud was practised ; but, although there " is no such case, yet if it appeared that the parties were " confederating together to cheat some one, although the " particular person was not known, the case would fall " within the same principle and must receive the same " determination." And Lord Erskine, in *Clifford vs. Brooke,* 13 *Vesey, Jr.,* 131, speaking of *Evans vs. Bicknell,* says, " the defendant did not mean to defraud the plain- " tiff ; but if evidence had been produced that he " parted with the deeds for the purpose of defrauding any " one, Lord Bacon's maxim would apply to such a case " of fraud, intended against one person, taking effect upon " another."

This pretended burning happened in 1811, when it does not appear that Joseph W. Cochran owed a single dollar to any one. He had not then become trustee for Sarah Armitage, nor had he become a surety, nor was he then indebted, and therefore a fraud could not at that time be committed upon any person. Old Mrs. Cochran had no interest,—no right,—no claim whatever, in this

contract, nor in any consequence flowing out of it. I do not see how a fraud could be intended or committed upon a person who had no right; and neither old Mrs. Cochran, nor any other person had then any claim upon the husband. Whom did the plaintiff design to cheat by this pretended burning? or upon whom did this fraud take effect? It pacified an unreasonable old woman, who had no interest in the matter, and it took effect upon nobody; for Cochran then had no creditor and the defendants in this cause had no knowledge of the contract until the plaintiff filed her bill against Gemmill in the year 1819; so that this pretended burning could not have induced them to become sureties in the year 1814, when the recognizance was entered into in Sarah Armitage's trusteeship. The truth is, that no fraud was or could be intended, from the nature of things, by this pretended burning and none was committed, and therefore this objection cannot prevail.

The joint possession of the goods and furniture by the husband and wife was consistent with the contract. It could not be supposed that the wife should part with them, and if they remained in her possession the husband must also have the possession. *Cadogan vs. Kennet, Cowper* 432 : *Jarman vs. Woolloton,* 3 *T. R.* 618, *and Campion vs. Cotton,* 17 *Vesey, Jr.* 264, show the whole doctrine on this subject, and that this is no evidence of fraud nor sufficient to bar the claim of the wife.

And it is no objection, that a schedule of the goods and furniture, interest money, rents, and real and personal estate intended for the wife's separate use, was not annexed to the contract ; for, as Lord Kenyon says, it would give no information to the rest of the world and its existence would only be known to the parties. 3 *T. R.* 618 : 17 *Vesey, Jr.* 264.

It is evident from the testimony that the husband received the rents and profits and interest of the complainant until the year 1819, and that until that period, when she

filed her bill against Gemmill, she had never enforced this contract against her husband or any other person. This is what the defendants' counsel called an abandonment of the contract; but no case in support of that position has been shown. In *Pawlet vs. Delavel*, 2 *Vesey, Sr.* 663, the wife was barred from claiming her separate estate after the death of her husband, but then they had called in the separate estate, discharged the trustees, and the money was placed out by the husband and managed by him, and after his death the wife, as his executrix, received the interest, gave receipts and mixed it with other parts of his estate. Afterwards, she married again and by a deed made by her and her second husband, treated this as the estate of her first husband. Under all these circumstances, the Lord Chancellor thought that the weight of evidence was in favor of the claimants under the deceased husband and decreed accordingly. There was in that case not mere acquiescence, but she performed repeated acts, while she was a wife and while *sole*, by which she treated the money as the property of her deceased husband, without any claim on her own separate account. And, what particularly weighed with the Chancellor was, that in the deed made by her and her second husband no notice was taken of any claim to this money, and although there were words importing that there was something to her separate use, there was nothing relative to this. It is evident from the whole case that all these acts combined induced the Lord Chancellor to decide as he did. Her acts while *sole* were alone sufficient. In *Powell vs. Hankey and Cox*, 2 *P. Wms.* 82, the wife was not permitted to recover from the executors of her husband the interest received by him, of securities and bonds assigned to her separate use, because she had for ten years together permitted the husband to receive this interest, without making the least objection, either to her husband or to the debtors who paid the money, or to her trustees, and it was therefore presumed that she had consented to his

receipt of the interest ; but, as to such part of the principal of these securities as he received, it was decreed that his executors should make the same good, with interest from his death.   Upon the same principle this husband, Joseph W. Cochran, should not account for the rents and profits and interest of the wife's separate estate which he has received, but after the bill filed by her in 1820 he has no right to receive, nor any debtor of his wife, for the separate property, to pay money to him.   There is no evidence that she did any act, or made any express or implied agreement, to abandon or yield to her husband her interest in this separate estate ; and the inattention or laches of a married woman cannot prejudice her.   2 *Atk.* 545.   Lord Eldon, in *Murray vs. Lord Elibank,* 10 *Vesey, Jr.* 90, says that " previously to a bill a trustee who has the wife's " property, real or personal, may pay the rents and profits, " and may hand over the personal estate to the husband. " Lord Alvanley, in *McCaulley vs. Phillips,* 4 *Vesey Jr.* 19, " has laid it down, that after a bill filed the trustee cannot " exercise his discretion further,—that the bill makes the " Court the trustee, and takes away his right of dealing "with the property as he previously had."   The wife's acquiescence makes the previous acts done valid, but it is not an abandoment, for she may resume her right, and by her bill stop all further payments to the husband.

It was mentioned in the argument, but not pressed, that this marriage contract does not secure the property from liability to the husband's debts, because there was no special covenant nor agreement in it to that effect.   The answer is, that he by his contract agreed that it should be her separate property, and if he could do this, it consequently was not his and could not be liable for his debts.   By his agreement he barred himself and every body else, as Lord Hardwicke said in *Peacock vs. Monk*; and all the cases establish this, so that reference to them on this head is not necessary.   His creditors must stand on the same footing as does the husband.

No objection was made by the counsel for the defendants, that the complainant did not execute this contract, and that point was properly omitted, because she granted nothing by it. The husband alone made the grant. He thereby yielded up his rights, and his execution alone was sufficient; but she accepted the contract and married him accordingly, and thereby became a party to it.

Let a decree be entered for a perpetual injunction, according to the prayer of the bill.

The decree of the Chancellor was affirmed, upon appeal, by the High Court of Errors and Appeals, at the June T. 1822.